# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 15, 2004

## HAROLD WAYNE SHAW v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No.95-D-2761   Seth Norman, Judge

---

### No. M2003-02842-CCA-R3-PC - Filed May 25, 2005

---

The petitioner, Harold Wayne Shaw, was convicted by a jury of second degree murder and aggravated kidnapping in 1996.  On direct appeal, this Court affirmed the petitioner's conviction, but remanded the case to the trial court for resentencing.  See State v. Harold Wayne Shaw, No. 01C01-9707-CR-00259, 1998 WL 731573 (Tenn. Crim. App, at Nashville, Oct. 21, 1998), perm. app. denied (Tenn. 1999).  On remand, the petitioner was resentenced.  The petitioner appealed, challenging his sentence for the second time, and this Court affirmed the judgment of the trial court. See State v. Harold Wayne Shaw, No. M1999-01119-R3-CD, 2000 WL 1606585 (Tenn. Crim. App., at Nashville, Oct. 27, 2000), perm. app. denied, (Tenn. 2001).  The petitioner filed a timely petition for post-conviction relief alleging ineffective assistance of counsel in various ways.  After a hearing, the post-conviction court denied the petition for post-conviction relief.  On appeal, the petitioner challenges the post-conviction court's dismissal of the petition.  For the following reasons, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Bruce Poag, Nashville, Tennessee, for the appellant, Harold Wayne Shaw.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, District Attorney General and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

<u>Factual Background</u>

The petitioner was convicted by a Davidson County jury of second degree murder and aggravated kidnapping in 1996. The trial court sentenced the petitioner as a Range II offender to serve eighteen (18) years for the aggravated kidnapping and thirty-five (35) years for the second degree murder, both sentences to be served consecutively. The petitioner appealed. <u>See</u> <u>State v. Harold Wayne Shaw</u>, No. 01C01-9707-CR-00259, 1998 WL 731573 (Tenn. Crim. App, at Nashville, Oct. 21, 1998), <u>perm.</u> <u>app.</u> <u>denied</u>, (Tenn. 1999). On direct appeal, this Court summarized the evidence at trial as follows:

> On December 29, 1993, at approximately 10:00 p.m., police officers and an ambulance were dispatched to G-Man's Market on Brick Church Pike in Nashville in response to a call that a shooting had occurred. Upon arrival, they found 24-year-old Corey Barbee on the floor, bleeding from several gunshot wounds. Barbee told them that "some dudes got Garland [Brinkley]." The victim was asked if the same men who had taken Garland had shot him, and Barbee responded "yes." He told them that three men in masks had entered the store, fired several shots, and then taken away the owner of the market (Garland Brinkley).
>
> Barbee was taken to Vanderbilt University Hospital, where over the next few days he underwent several surgeries. Fourteen days later, on January 12, 1994, Corey Barbee died of complications from the gunshot wounds to his chest and abdomen.
>
> Garland Brinkley, whose nickname is "G-Man," was the owner of G-Man's Market. About six months earlier, Brinkley was involved in some drug transactions, specifically cocaine, with a man he knew as Harold Moore, but whose name was actually Harold Shaw, the Defendant. Brinkley testified that he and Defendant agreed that Defendant would "front" the cocaine to Brinkley to sell, and then Brinkley would later pay Defendant. The cocaine was actually given to Brinkley by a man named Eric, who Brinkley testified was a "go-between." Brinkley testified that in two such transactions, he gave the drugs to someone else to sell. The proceeds from the drug deals were apparently never given to Brinkley so he in turn never returned any of the proceeds to Defendant. It is not clear from the record as to the total amount and value of the cocaine in the transactions. At the preliminary hearing, Brinkley said he owed $3,800 for three ounces on the first transaction and $9,000 for 12 ounces on the second deal. However, he told investigators and testified at trial that the deals involved a quarter kilo valued at $27,000.

Brinkley testified that on the morning of December 29, 1993, Defendant telephoned him at the store and demanded that Brinkley turn over his house and his Chevrolet Blazer as payment for the cocaine debt. Defendant claimed that Brinkley owed him $27,000 plus a $5,000 late fee, for a total of $32,000. Later that morning, Defendant came to G-Man's Market and again demanded payment from Brinkley. However, Brinkley refused and Defendant left.

Brinkley testified that later that evening, Corey Barbee, known as "Bruno," was at the store with Brinkley. Barbee and Brinkley had been friends for several years. Barbee would stop by the market and watch television and would sometimes help Brinkley clean the store and close it at night. As they were closing the store on the night of December 29, 1993, the door suddenly flew open and a masked man stepped in and shot Barbee five or six times. Brinkley described the shooter as a black male, about six feet tall and 175 pounds, with a hood over his head in addition to the mask. He was armed with what Brinkley described as a nine millimeter Glock or Beretta. The shooter was followed into the market by two more men. The second man had no mask on his face, but only a hood and sunglasses. Brinkley recognized this man as Harold Moore (Shaw), the Defendant. Defendant was armed with a pistol-grip shotgun. The third man, who was also masked, was shorter and chubbier. According to Brinkley, all three men were black.

After Barbee was shot, Barbee asked to use the phone to call an ambulance. He then managed to get to the phone and call 911 for help. Brinkley testified that the Defendant then ordered Brinkley to leave the market with them. Brinkley said that he initially refused and that the man who had shot Barbee then "shot me and grazed my leg." He testified that the bullet did not enter his leg, but that he has a scar from being grazed. However, there is apparently no medical record of such a graze wound. Brinkley eventually got into the 1976 or 1977 blue Chevrolet Impala with the three men. Barbee was left at the market.

This same evening, Clara Coleman was helping in some remodeling work on a business located in the same building as G-Man's Market. She heard gunshots and looked out in time to see a light blue older model car speed away from the market. She testified that she saw three or four black men in the car. Ms. Coleman did not know Brinkley.

As the car drove off, Defendant told the shooter to put duct tape over Brinkley's face and to bind his hands together with the tape also. Defendant held the shooter's gun while he taped up Brinkley. According to Brinkley, the car ride lasted about 15 to 25 minutes. Defendant kept saying to Brinkley, "you think I'm playing with you?" The car eventually came to a stop and the men pulled Brinkley out and took him into a garage or shed. They bound his feet with duct tape. There the three men proceeded to beat Brinkley. Defendant pistol-whipped him. Brinkley testified

that he believes he passed out two or three times during the beatings which he estimated lasted "for hours." Defendant then forced Brinkley to make several cellular phone calls in an effort to have Brinkley's wife bring the deed to their house. Calls were made to Brinkley's mother, aunt, brother-in-law, and a cousin, but they could not locate Brinkley's wife.

Brinkley said that three or four more black men later joined the group and participated in the beatings. Brinkley still had tape over his eyes, but he said he could tell the men were black by their voices. The men took his wallet which had about $300 cash in it. They cut his pants and inflicted a four to five inch laceration on his left thigh. According to Brinkley, his attackers poured some liquid on his wound and attempted several times to light it with a match, although doctors were unable to find any evidence of burns. However, a trauma surgeon who treated Brinkley at Vanderbilt testified that lacerations often produce a burning sensation, particularly if liquid is poured on them.

The beatings continued until someone said "kill him." At this point, most of the men stepped outside to confer, but when they returned Brinkley was told that he was "lucky." They then cut the tape from his ankles, threw him back in the car, and drove to Whites Creek Pike. The car slowed down near the United Parcel Service location and Brinkley was thrown out. He testified that as he rolled down an embankment, he heard two or three shots fired. The car then took off.

Brinkley was able to pull the tape from his eyes enough to see, and he then walked to the UPS security guard station. One guard called 911 while the other cut the tape from Brinkley's face and wrists. An ambulance took Brinkley to Vanderbilt Hospital where he was treated for a fracture to his upper jaw, a large cut on the back of his scalp, a cut on his left thigh, injuries to his mouth, and rib pain suggesting a fractured rib. Brinkley was discharged from Vanderbilt on December 31, 1993.

Investigators found six nine millimeter shell casings, two outside the market and four inside. Brinkley acknowledged that the fully-loaded .357 revolver found on the floor of the market belonged to Barbee, who usually carried it in his coat pocket. Also, a fully-loaded nine millimeter semiautomatic pistol was found under the cash register. Brinkley identified that gun as belonging to him. Officer Brad Corcoran testified that neither of these weapons appeared to have been fired. The only fingerprints identified at the scene were those of Brinkley and Barbee.

On January 12, 1994, the day Corey Barbee died, homicide detectives Johnny Lawrence and Mike Roland interviewed Brinkley. They showed Brinkley a photographic array from which Brinkley identified Defendant as the leader of the group that kidnapped him and killed Barbee.

-4-

The day after Brinkley was released from the hospital, Defendant called him and reiterated that he wanted the deed to Brinkley's house. When Brinkley asked why Defendant allowed Barbee to be killed, Defendant replied, "I don't give a f--- about him." Defendant continued to call Brinkley every day and sometimes several times a day. Brinkley finally called the police because of the harassing calls from Defendant. Detectives went to Brinkley's house and recorded two incoming calls from Defendant. In those calls, Brinkley and Defendant argued about the shooting of Barbee. However, Detective Clifford Douglas admitted that police made no attempt to trace the telephone calls, nor was any voice analysis done in an attempt to determine whether the calls were actually made by Defendant. Defendant continued to call Brinkley until Brinkley was incarcerated for food stamp fraud.

Brinkley acknowledged that after the incident, he was admitted to Tennessee Christian Medical Center where he claimed he remained for about a month for psychological problems. However, Brinkley admitted on cross-examination that he was only at the mental health facility for twelve days. Brinkley told a doctor at the center that he had been assaulted and kidnapped for no reason by six men. Although documented by the doctor, Brinkely denied at trial telling the doctor that he heard voices in his head or that he had fears that his friends would turn on him.

There were many inconsistencies in Brinkley's testimony. For instance, Brinkley told detectives and he testified at the preliminary hearing that he was shot, not grazed in the leg as he later claimed. He initially told police that his ankles were taped while he was in the car and that a hood was placed over his head. However, at trial he testified that only his hands were bound and that tape, not a hood, was placed over his eyes. He acknowledged falsely testifying at the preliminary hearing that his nose was broken, and that both his upper and lower jaws were broken. He testified that during the beatings that he called his cousin, Becky Bonds, and told her to go to the G-Man's Market and try and find his wife. However, Ms. Bonds testified that Brinkley called her and told her to go to the market in order to put the telephone back on the hook. Brinkley originally told police that he was assaulted due to a dispute about "running numbers," not drugs, at his market. He testified at the preliminary hearing that he was hospitalized for four or five days. He said that if hospital records indicated that he spent only one night in the hospital, "I know that would be a lie." Brinkley testified at trial that he first met Defendant when both attended Maplewood High School in 1984 or 1985. However, he admitted testifying at the preliminary hearing that he met Defendant two years before the shooting at his auto detail shop. There were also numerous inconsistencies and discrepancies in his testimony pertaining to the drug transactions, such as when exactly the transactions occurred and the amount of drugs and money actually involved.

Harold Wayne Shaw, 1998 WL 731573, at *1-4.

On direct appeal, this Court affirmed the petitioner's convictions, but remanded the case to the trial court for resentencing because the trial court mistakenly sentenced the petitioner as a Range II, persistent offender, misapplied two statutory enhancement factors and failed to make findings of fact and conclusions of law sufficient to support the imposition of consecutive sentences. State v. Harold Wayne Shaw, 1998 WL 731573, at *11-15. On remand, the trial court resentenced the petitioner as a Range I, standard offender to serve ten (10) years for the aggravated kidnapping and twenty-two (22) years for the second-degree murder. The trial court again ordered the petitioner to serve the sentences consecutively.

The petitioner appealed to this Court for a second time. On appeal, this Court affirmed the judgment of the trial court, determining: (1) that the length of the petitioner's sentence was appropriate; and (2) that although the record did not support the trial court's finding that the petitioner was a professional criminal, the trial court was correct in finding that the petitioner had an extensive criminal history; thus consecutive sentences were also appropriate. State v. Harold Wayne Shaw, 2000 WL 1606585, at *1.

After the Tennessee Supreme Court denied the petitioner's application for permission to appeal, the petitioner filed a timely petition for post-conviction relief on May 13, 2002, alleging ineffective assistance of counsel at trial. The petitioner filed additional petitions on December 15, 2002, April 29, 2003, and an amended petition on September 2, 2003.

Proof at the Evidentiary Hearing

At the evidentiary hearing, the petitioner testified that he was incarcerated at Riverbend Maximum Security Prison, serving a thirty-two (32) year sentence for second degree murder and aggravated kidnapping. During trial, he was represented by two attorneys from the Public Defender's Office. The petitioner complained that neither of the attorneys subpoenaed witnesses on his behalf. Specifically, he complained that they did not subpoena his cousin "Eric," who allegedly was involved in the drug transactions. The petitioner also complained that the attorneys did not call Tim Shaw or Eugene Welch to testify on his behalf to clarify discrepancies in the State's testimony. The petitioner was unable to state whether the attorneys were able to locate these witnesses.

The petitioner also testified that his trial counsel failed to request a Dyle jury instruction regarding identity. The petitioner claimed that the State's key witness at trial testified that he got the drugs directly from the petitioner and this information was not in the police report, thus his identity was at issue and the jury should have been given an instruction on identity. Further, the petitioner stated that trial counsel failed to obtain, request and secure the services of a voice identification witness. The petitioner claimed that the voice on the recorded telephone calls introduced by the State during witness Brinkley's testimony was not his and that a voice identification expert would have proven that he did not call Brinkley. During trial, Brinkley testified that the petitioner called him several times and the recorded telephone calls were introduced into evidence. During the telephone calls, the voice purporting to be the petitioner demanded money, Brinkley's house and Brinkley's car.

-6-

The petitioner also stated that his attorneys failed to object and/or move for a mistrial when it was disclosed in front of the jury that he was on the TBI's "Most Wanted List." The petitioner admitted that the second time the district attorney mentioned that he was on the list, his attorneys objected and moved for a mistrial. However, the petitioner complained that even though his attorneys objected and sought a mistrial the second time, they failed to request a curative instruction. Further, the petitioner complained that the jury instructions were flawed and that the police reports should have been presented to the jury so that the jury could see the inconsistencies in the witness statements.

The petitioner also claimed that his attorneys violated his attorney-client privilege by disclosing his incarceration to the district attorney, which allowed the district attorney to change a witness's testimony. The petitioner claimed that his attorney was inadequate in impeaching witness Brinkley regarding the inconsistencies in Brinkley's testimony. Further, he claimed that his attorney was ineffective in not assuring that the trial court charged the jury with the proper lesser included offenses. Finally, the petitioner claimed that the prosecution failed to prove the necessary elements of second degree murder, that trial counsel should have had him evaluated for a mental condition and that trial counsel should have impeached Dr. Charles Harlan.

Lead trial counsel for the petitioner testified that she has been practicing exclusively criminal law since 1992, and that she worked for the public defender's office for seven (7) years before beginning a private practice. At the time of the hearing, trial counsel had been practicing law for ten (10) years. At the time of the petitioner's trial, she had tried significant cases and was certified to defend capital cases.

Trial counsel stated that she spent almost two hundred (200) hours on the petitioner's case. Trial counsel recalled that approximately twenty-five (25) hours were spent in court and 170 hours were spent out of court. Trial counsel testified that she was aware of the many inconsistencies with Brinkley's testimony and that she and co-counsel tried to narrow some of the more important issues down prior to trial. Trial counsel acknowledged that Brinkley was not only a victim, but was the only identification witness to testify. As a result, trial counsel felt that it was important to try to impeach Brinkley with the many discrepancies in his testimony, so she made a list of possible inconsistencies in Brinkley's story prior to trial. Trial counsel also remembered that she had an investigator search for Tim Shaw, whose name first came up at the preliminary hearing, Harold Moore, and "Eric." The investigator was unsuccessful in locating any of those individuals.

Trial counsel testified that she remembered that a detective mentioned in his testimony that the petitioner was on the TBI "Most Wanted List." At the time, she and co-counsel looked at each other, then looked at the jury. Because the jury did not seem to react to the testimony, trial counsel testified that she did not want to make a big deal out of it. However, later on during the trial, when the district attorney questioned a witness regarding the TBI "Most Wanted List," trial counsel objected and asked for a mistrial during a jury-out hearing. The trial court denied the objection and the motion for mistrial. Trial counsel testified that she did not seek a curative instruction because the objection was denied.

Trial counsel claimed that she did not recall giving any privileged information to the district attorney, but that it was possible she could have told the district attorney that the petitioner was in jail at the time of the incident. Finally, trial counsel testified that she did not seek a mental evaluation of the petitioner because she did not think it was warranted or necessary.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In a written opinion, the post-conviction court denied the petition, making the following findings of fact and conclusions of law:

1. Petitioner clams that counsel was ineffective for failing to subpoena certain witnesses whom he claims would have assisted in securing an outcome different from that which resulted. Petitioner contends that a man simply referred to as "Eric" should have been subpoenaed and that counsel failed to do so upon his request. Eric has since committed suicide and is, therefore, unavailable to testify. Petitioner claims that Eric would have testified that he was not a middleman for alleged drug deals conducted between petitioner and Garland Brinkley, the surviving victim of these offenses. [Trial counsel] testified at the post-conviction evidentiary hearing that she was never given a last name or any specific information on this witness and he was, thus, never subpoenaed. According to the trial transcript, [trial counsel] pointed out several testimonial inconsistencies of Mr. Brinkley, including the alleged drug transactions with various individuals. The testimony of Eric may have further impeached Mr. Brinkley's credibility, but it is not convincing that the absence therof prejudiced the petitioner's defense.

The next witnesses petitioner claims counsel should have secured were Tim Shaw and Eugene Welch, both of whom Mr. Brinkley testified were involved in some of the drug transactions which took place. [Trial counsel's] investigator tried to locate Tim Shaw and secure his appearance, but to no avail. Mr. Welch was not mentioned until trial, at which time [trial counsel] had an assistant conduct a cursory investigation which produced no results. Petitioner did not offer any proof other than his own testimony to support his contention that he was prejudiced by counsel's failure to subpoena them.

The final witness that the petitioner claims should have been subpoenaed was Clara Coleman who was working next door when Mr. Barbee was shot. However, petitioner neither subpoenaed this witness nor offered any proof as to how her presence would have assisted in his defense. These issues are without merit.

2. The petitioner's next complaint is that counsel was ineffective for failing to "correct false and misleading testimony" given by the State's main witness and victim Garland Brinkley. According to both petitioner and [trial counsel], Mr. Brinkley was quite inconsistent regarding every aspect of his testimony in this case. From the trial transcripts and [trial counsel's] testimony at the evidentiary hearing,

it seems as though she exploited every weakness and inconsistency in Mr. Brinkley's testimony. On p. 163 of the trial transcript, on cross-examination, [trial counsel] pointed out the fact that although at trial he testified that he had never physically received any drugs from the petitioner, Mr. Brinkley reported to the police that the petitioner actually gave him drugs on the first transaction. Then on p. 164, Mr. Brinkley testified that there was a lapse of about three weeks from the date of the first transaction until the commission of the offenses in this case, but [trial counsel] brings up the fact that he previously told Detective Lawrence that the lapse was about six-and-a-half-months. On pages 154-159, [trial counsel] points out that Mr. Brinkley's testimony changes regarding from whom he got and to whom he gave the drugs in the prior transactions. She notes that his previous testimony indicated that he had initially received the drugs from petitioner and given them to Tim Shaw, but that he was then testifying to the converse of that scenario. Mr. Brinkley then goes on to state that he actually gave the drugs to Eugene Welch, which was a completely different recollection than testimony given at the preliminary hearing, as illustrated by [trial counsel]. She also further impeached the witness' credibility by noting his propensity to stretch the truth regarding the extent of his injuries through doctors' reports and testimony.

These are but a few of several instances wherein [trial counsel] exhausted her resources in an attempt to impeach the credibility of the witness. . . . She also testified that, prior to trial, she had drafted a four page list of inconsistent statements made by Mr. Brinkley up to that point. It does not follow that [trial counsel's] representation of the petitioner was deficient in this area.

3. The petitioner next contends that counsel was ineffective for not objecting or moving for mistrial upon mention at trial that petitioner was on the T.B.I's most wanted list. However, counsel did, in fact, move for a mistrial and a jury-out hearing was held prior to the Court's determination that no such action was warranted. The Criminal Court of Appeals stated that counsel should have requested a curative instruction, but that refraining from doing so could be a legitimate trial tactic. [Trial counsel] testified that, as part of the defense strategy, she did not want to draw any further attention to the fact that petitioner was on the T.B.I's most wanted list, so the issue was dropped. This issue is without merit.

4. Petitioner believes that counsel was ineffective for not requesting a mental evaluation. [Trial counsel] testified that the petitioner did not give her any indication that such an examination was warranted. From the testimony and the apparent lucidity and intelligence of the petitioner, the court is satisfied with [trial counsel's] response.

5. The petitioner alleges ineffective assistance of counsel on the grounds that a Dyle instruction was never requested. . . . The Court is of the opinion that counsel's

failure to request the Dyle instruction was harmless at most. Despite all the effort expended by counsel to impeach the credibility of the State's main witness, Mr. Brinkley, the jury apparently unanimously believed his testimony and found the petitioner guilty. . . . There were copious amounts of proof offered which supported the allegation that Mr. Brinkley had been involved in drug transactions with the petitioner in one way or another. Mr. Brinkley testified that, not only did he see the petitioner, but that he also recognized his voice. Further, Mr. Brinkley testified that, on the night of the offenses, the petitioner was wearing the same clothes from earlier that day, when he came into Mr. Brinkley's store to threaten him, regarding the money he owed petitioner from the drug transactions. It must also be noted that Mr. Brinkley was able to identify the petitioner in a photo lineup, as well as in court, during trial. This issue is without merit.

6. Petitioner alleges that his defense was prejudiced by counsel's failure to obtain, request or secure the services of a voice identification expert to analyze the recorded telephone conversations between Mr. Brinkley and someone purported to be the petitioner. Counsel filed a motion to suppress this evidence, but it was denied by the Court. At the evidentiary hearing, [trial counsel] testified that the voice on the tape sounded similar enough to that of the petitioner that she wanted to suppress it. She also stated that another reason to move for suppression of the recording was that the person purported to be the petitioner showed a lack of denial regarding actions against Mr. Brinkley. It does not appear as though [trial counsel] was ineffective in handling this issue.

> . . . .

9. Petitioner next asserts that counsel was ineffective for failing to request jury instructions on reckless homicide, criminally negligent homicide and voluntary manslaughter as lesser-included offenses of first-degree premeditated murder and first-degree felony murder. Petitioner relies on State v. Burns, 6 S.W.3d 453 (Tenn. 1999), as support for this contention. . . . Burns was decided by the Tennessee Supreme Court on November 8, 1999.

Furthermore, it is unclear as to how the issue of lesser-included offenses could have played a major role in the defense tactics of the petitioner during the trial of this matter. If the petitioner denies any participation in the commission of these offenses, as he apparently had in this case, the issue of utmost importance would be identity. The defendant was either a party to the events which occurred, or he was not. The jury credited the testimony of the State's witnesses and, accordingly, found the petitioner guilty of second degree murder and aggravated kidnaping [sic], but acquitted him of first degree murder, attempt to commit first degree murder and especially aggravated robbery. Considering the volume of proof offered at trial

against the petitioner, he does not appear to have been prejudiced by counsel's failure to request lesser-included offenses. This issue is without merit.

The petitioner has failed to show by clear and convincing evidence that counsel's performance was deficient. Based on the foregoing analysis, the Court is of the opinion that the Petition for Post-Conviction for Relief should be dismissed.

The petitioner filed a timely notice of appeal, challenging the post-conviction court's denial of the petition for post-conviction relief.

## Analysis

### Post-Conviction Standard of Review

To sustain a petition for post-conviction relief, a defendant must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the trial court's findings unless the evidence in the record preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. See State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). All questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578-79. However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

### Ineffective Assistance of Counsel

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. See Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to

prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley, 960 S.W .2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. See id. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. See Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. See id. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. See Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, the petitioner argues that trial counsel was ineffective for the following reasons: (1) failing to subpoena witnesses at trial; (2) failing to impeach the testimony of Mr. Brinkley; (3) failing to request a Dyle instruction; (4) failing to request a mental evaluation of the petitioner; (5) failing to move for a mistrial when a witness stated that the petitioner was on the TBI's "Most Wanted List;" (6) failing to request jury instructions on lesser included offenses; and (7) failing to request a voice identification expert to analyze the recorded telephone calls. The State argues that because the petitioner failed to prove his claim of ineffective assistance of counsel by clear and convincing evidence, the post-conviction court properly denied the petition.

A. Failure to Subpoena Witnesses

The petitioner first claims that trial counsel was ineffective for failing to subpoena a witness whom he claims would have assisted in securing a different outcome at trial. Specifically, he argues that a man simply referred to as "Eric" should have been subpoenaed and that counsel failed to do so even after he requested the subpoena. The petitioner claimed at the hearing that "Eric" has since committed suicide and is, therefore, unable to testify. The petitioner stated that "Eric" would have testified that he was not a middleman for the alleged drug deals conducted between petitioner and Mr. Brinkley. The petitioner also claimed that trial counsel failed to subpoena Tim Shaw and Eugene Welch, witnesses that would have clarified discrepancies in the State's proof.

At the hearing, trial counsel testified that she was unable to locate any of these witnesses and was, therefore, unable to subpoena them for trial. The post-conviction court determined that trial counsel pointed out several inconsistencies in the State's proof without the benefit of these witnesses.

The petitioner has failed to produce the witnesses at the evidentiary hearing and failed to demonstrate that any prejudice resulted from trial counsel's alleged failure to subpoena these witnesses. A defendant is not entitled to relief on this ground unless he can produce a material witness who would have testified in support of his defense at the evidentiary hearing. Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Further, in addition to producing the witnesses at the post-conviction hearing, to establish that he was prejudiced by counsel's failure to subpoena witnesses, the petitioner was required to: (1) show that through reasonable investigation, trial counsel could have located the witness; and (2) elicit favorable and material testimony from the witness. Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black, 794 S.W.2d at 757). The petitioner has failed to satisfy his burden. This issue is without merit.

### B. Failure to Impeach Witness

The petitioner next complains that trial counsel was ineffective for failing to "correct false and misleading testimony" given by the State's main witness and victim Garland Brinkley. Both the petitioner and trial counsel testified that Mr. Brinkley was quite inconsistent regarding every aspect of his testimony. Trial counsel testified that she prepared a four-page document prior to trial wherein she listed all of the inconsistent statements made by Mr. Brinkley. The post-conviction court determined after reviewing the trial transcripts that it appeared that trial counsel exploited nearly every weakness and inconsistency in Mr. Brinkley's testimony.

The petitioner failed to identify specific inconsistencies in Mr. Brinkley's testimony that trial counsel neglected to exploit. Further, the petitioner has not demonstrated prejudice caused by trial counsel's alleged failure to impeach Mr. Brinkley any further than was done. This issue is without merit.

### C. Failure to Request Dyle Instruction

Next, the petitioner alleges ineffective assistance of counsel on the grounds that trial counsel did not request a Dyle instruction. The State argues that the post-conviction court properly determined that the failure of counsel to request a Dyle instruction was "harmless at most."

Under State v. Dyle, 899 S.W.2d 607 (Tenn. 1995), it is plain error to fail to give the instruction on identification when identification is a material issue, i.e., "when either (1) the defendant puts it at issue, or (2) the witness testimony is uncorroborated by circumstantial evidence." Id. at 612 n.4. If the defense fails to request the instruction when identity is a material issue, then such failure is to be reviewed under a Rule 52 harmless error standard. Id. Rule 52(a) of the Tennessee Rules of Criminal Procedure provides as follows: "Harmless error. -- No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits."

The post-conviction court, in its memorandum opinion denying post-conviction relief, reviewed this issue in the context of the ruling in Dyle. The post-conviction court concluded that

-13-

the failure to request the instruction was "harmless at most," and therefore trial counsel did not render ineffective assistance of counsel failing to request the instruction.

Testimony at the post-conviction hearing on other issues, not presented for appeal in this case, reflect that the petitioner did not testify at his trial. At trial, Mr. Brinkley identified the petitioner as one of three men who entered his store on the night of December 29, 1993, and kidnapped him after one of the men shot Corey Barbee. Two weeks after the shooting, homicide detectives interviewed Brinkley. The detectives showed him a photographic array from which Brinkley identified the petitioner as the leader of that group. Police subsequently tape-recorded two phone calls from the petitioner to Brinkley, in which the two angrily discussed the events of December 29, 1993, and the shooting of Barbee. Brinkley identified the voice at the other end of those calls as that of the petitioner. At trial, Brinkley identified the petitioner in the courtroom as the person who was present when Barbee was shot and when he was kidnapped. Brinkley's identification of the petitioner as the perpetrator was never contradicted by any other evidence or by any inconsistent identifications. Again, he identified the petitioner in the photo lineup as the perpetrator as well as the in-court identification at trial. He also identified the petitioner's voice on the taped telephone calls. Despite trial counsel's vigorous attempt to discredit Brinkley, the jury weighed his testimony and found Brinkley's identification of the petitioner sufficient to convict.

Brinkley's identification of the petitioner was very certain and other evidence corroborated that identification. It seems unlikely that a Dyle instruction would have altered the jury's verdict. Assuming arguendo that trial counsel fell below the appropriate standards of representation by failing to request the Dyle instruction, we are unable to determine from this record that the petitioner was prejudiced by such failure, i.e., that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Because the petitioner failed to prove by clear and convincing proof that he was prejudiced by the failure of trial counsel to request the jury instruction for identification, we conclude that the trial court did not err in dismissing the petition for post-conviction relief in this regard. This issue is without merit.

## D. Failure to Request Mental Evaluation

The petitioner complains that trial counsel was ineffective for not requesting a mental evaluation. The State argues that the post-conviction court properly determined that trial counsel was not ineffective for failing to request a mental evaluation when trial counsel testified that there was no indication that an examination was warranted.

Upon review of the record, we conclude that the evidence presented on appeal does not preponderate against the findings of the post-conviction court. Trial counsel testified that the petitioner gave her no indication of mental problems. The post-conviction court determined that the petitioner's "lucidity and intelligence" was "apparent" from the testimony at the hearing. Moreover, the testimony reveals that the lines of communication were open and used by both the petitioner and his trial counsel, allowing the petitioner to make well-informed decisions and assist in his defense. In sum, the petitioner has failed to show by clear and convincing evidence that trial counsel's failure

to request a mental evaluation prior to his pleas constituted deficient performance. Further, trial counsel's performance cannot be deemed deficient for failure to secure a mental evaluation in the absence of a factual basis to support a mental evaluation. See Charles William Young v. State, No. M2002-01815-CCA-R3-PC, 2004 WL 305790 (Tenn. Crim. App., at Nashville, Feb. 18, 2004); Edward A. Wooten v. State, No. 01C01-9702-CC-000067, 1998 WL 255440 (Tenn. Crim. App., at Nashville, May 21, 1998), perm. app. denied, (Tenn. 1999). We conclude that the petitioner has failed to demonstrate that trial counsel was ineffective for failing to pursue a mental evaluation. This issue is without merit.

### E. Failure to Object of Move for Mistrial

The petitioner next contends that trial counsel was ineffective for not objecting or moving for a mistrial upon first mention at trial that the petitioner was on the TBI's "Most Wanted List." The State argues that trial counsel motioned for a mistrial when the petitioner's status on the "Most Wanted List" was mentioned for a second time and that the trial court properly denied the petition on this basis.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." Id. The authority to discharge a jury is to be exercised only when there is a cogent reason or manifest necessity. Jones v. State, 403 S.W.2d 750, 754 (Tenn. 1966).

In the case herein, according to the opinion of this Court on direct appeal, during cross-examination of a police detective called as a witness by the petitioner, the State asked if the petitioner was on the TBI's "Most Wanted List" at the time of his taped telephone calls to Brinkley. Harold Wayne Shaw, 1998 WL 731573, at *10. Trial counsel moved for a mistrial and the trial court conducted a bench conference out of the hearing of the jury. The court found that an earlier witness, Homicide Detective Johnny Lawrence, had already testified, without objection, that the petitioner was placed on the TBI's "Most Wanted List." Although the trial court denied the mistrial motion, it did instruct the prosecutor to not "go any further on it, General." Id. Trial counsel did not request a curative instruction. This Court determined that when the trial court denied the petitioner's motion for a mistrial, a curative instruction should have been requested. Id. However, this Court noted that "such a decision would have been a legitimate trial tactic." Id.

In our view, the record does not preponderate against the post-conviction court's finding that trial counsel was not deficient in her performance for failing to move for a mistrial. The witness's reference to the petitioner's status on the "Most Wanted List," while prejudicial, would not have given rise to a "manifest necessity" to stop the trial. Further, trial counsel did move for a mistrial when the petitioner's status on the "Most Wanted List" was mentioned for a second time and

-15-

testified that she did not request a mistrial at first mention of the list because the jury did not react to the statement. While trial counsel certainly could have sought a curative instruction, we cannot second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. See Adkins, 911 S.W.2d at 347. This issue is without merit.

### F. Failure to Hire Voice Identification Expert

Next, the petitioner argues that trial counsel was ineffective for failing to "have an expert witness analyze the recorded telephone calls that allegedly took place between Petitioner and Brinkley." The State fails to address this argument.

At the evidentiary hearing, the petitioner testified that he thought his attorneys were going to have "scientific tests" conducted on the tapes to prove that his voice was not on either one of the recordings and that they would "compare" his voice with the voice on the tape. Trial counsel, on the other hand, testified that the voice on the tape sounded enough like the voice of the petitioner to prompt her to file a motion to suppress the tapes. This motion was unsuccessful.

At the post-conviction hearing, the petitioner failed to present any expert proof that his voice is indeed not the voice on the tape recording. The petitioner has not satisfied his burden to justify post-conviction relief. This issue is without merit.

### G. Failure to Request Jury Instructions

Finally, the petitioner asserts that he "should have been entitled to jury instructions for the lesser included offenses of first degree murder as charged in Count One and Count Two of the indictment" in addition to second degree murder that was charged. Specifically, the petitioner argues that the jury should have been charged with voluntary manslaughter, criminally negligent homicide and reckless homicide.

According to this Court's opinion on direct appeal, the jury was charged on the offenses of premeditated first degree murder, criminal responsibility for facilitation of first degree murder, and second degree murder. On direct appeal, the petitioner complained that facilitation of second degree murder should have been charged. Harold Wayne Shaw, 1998 WL 731573, at *10-11. This Court determined that the petitioner waived the issue for failing to raise it in a motion for new trial and failed to find plain error. Id. The petitioner did not allege on direct appeal that the trial court erred in failing to charge the jury with the offenses he now complains should have been included at trial.

A trial court has a duty to charge the jury on all lesser included offenses included in the indictment even if the defendant does not request it. Tenn. Code Ann. § 40-18-110. However, as noted by the post-conviction court herein, the petitioner relies on State v. Burns, 6 S.W.3d 453

(Tenn. 1999), as support for his argument.  In <u>Burns</u>, the Tennessee Supreme Court adopted a test in determining lesser-included offenses. Under this test, an offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
> (1) a different mental state indicating a lesser kind of culpability; and/or
> (2) a less serious harm or risk of harm to the same person, property or public interest; or
> (c) it consists of
> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

<u>Id.</u> at 467.  An instruction on a lesser included offense must be supported by some factual basis. <u>Burns</u>, 6 S.W.3d at 467.  <u>Burns</u> was decided by the Tennessee Supreme Court on November 8, 1999. This Court affirmed the petitioner's convictions on April 28, 1999, several months prior to the release of the <u>Burns</u> decision.

This Court has previously declined to apply Burns retroactively to post-conviction cases where the direct appeal was concluded prior to Burns.  <u>See</u> <u>James Richard Bishop v. State</u>, No. E2000-01725-CCA-R3-PC, 2001 WL 798065, at *8 (Tenn. Crim. App., at Knoxville, July 13, 2001), <u>perm.</u> <u>app.</u> <u>denied</u>, (Tenn. 1999).  Further, a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented."  Tenn. Code Ann. § 40-30-106(g).  The claim for relief is not waived if it is (1) "based upon a constitutional right not recognized as existing at the time of trial," and (2) "either the federal or state constitution requires retroactive application of that right."  Tenn. Code Ann. § 40-30-106(g)(1).  The petitioner herein did not raise this issue on direct appeal and has failed to show that the claim for relief is not waived.  We determine that the petitioner has waived this issue.  Moreover, we note that the jury found the petitioner guilty of second degree murder and aggravated kidnapping, but acquitted the petitioner of first degree murder, attempt to commit first degree murder and especially aggravated robbery.  The petitioner has failed to show that he was prejudiced by counsel's failure to request an instruction on any further lesser included offenses.  This issue is without merit.

Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____

JERRY L. SMITH, JUDGE